LYNG, SECRETARY OF AGRICULTURE, ET AL. *v.*
PAYNE ET AL.

No. 84–1948.   Argued March 24, 1986—Decided June 17, 1986

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 943.

*Bruce N. Kuhlik* argued the cause for petitioners. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Geller, Robert E. Kopp,* and *Richard A. Olderman.*

*Theodore L. Tripp, Jr.,* argued the cause and filed a brief for respondents.

JUSTICE O'CONNOR delivered the opinion of the Court.

Federal law vests in the Secretary of Agriculture the authority to make emergency loans to farmers who suffer economic losses as a result of a natural disaster. See Consolidated Farm and Rural Development Act (Act), §§ 321–330, 75 Stat. 311, as amended, 7 U. S. C. §§ 1961–1971.

Pursuant to an agency rule, the Secretary required loan applicants suffering from disasters occurring between December 26, 1972, and April 20, 1973, to file their applications by April 2, 1974. 39 Fed. Reg. 7569 (1974) (later codified at 7 CFR § 1832.82(a) (1975)). That rule embodied a statutory command to keep the loan program open at least until that date. Pub. L. 93–237, 87 Stat. 1025. The question presented is whether a federal court has the remedial authority to reopen this long-terminated loan program on the basis of its finding that the Secretary, in alleged violation of another rule, failed adequately to notify affected farmers of the program's availability and terms.

I

In early April 1973 torrential rains struck 13 counties in the northern part of Florida. Initial estimates, which were later sharply reduced, projected that resulting crop and property losses would be in excess of $3 million. In light of the scope of these anticipated losses, on May 26, 1973, President Nixon declared the region a major disaster area. 38 Fed. Reg. 14800 (1973). See Disaster Relief Act of 1970, Pub. L. 91–606, 84 Stat. 1744 (repealed or transferred 1974). As a result of this declaration, the Secretary of Agriculture came under a statutory obligation to "make loans" to qualifying individuals in the region. 7 U. S. C. § 1961(b) (1970 ed., Supp. III).

At the time of the declaration, the federal disaster relief program, like much of the rest of the Federal Government, had become embroiled in a budgetary dispute between the Executive and Legislative Branches. In 1972, Congress had passed Pub. L. 92–385, 86 Stat. 554, which authorized emergency loans under terms far more generous than those available under later versions of the Act. Under the 1972 law as implemented by the Secretary, loans carried a 1% interest rate and were not conditioned upon the unavailability of alternative sources of credit. In addition, the Secretary was

directed to forgive outright up to $5,000 of the principal of the loan. On December 27, 1972, as part of a larger, administrationwide effort to control what were viewed as excessive congressional appropriations, the Secretary directed that regional Farmers Home Administration (FmHA) officials effectively cease processing loan applications. See generally *Berends* v. *Butz*, 357 F. Supp. 143 (Minn. 1973); Impoundment of Appropriated Funds by the President: Joint Hearings before the Ad Hoc Subcommittee on Impoundment of Funds of the Senate Committee on Government Operations of the Senate Committee on the Judiciary, 93d Cong., 1st Sess., 532 (1973). Aware that the "forgiveness features and low interest rates provided for by Public Law 92–385" had contributed to the unilateral executive decision to curtail the program, Congress attempted to resolve the crisis by repealing those provisions. S. Rep. No. 93–85, p. 1 (1973). Public Law 93–24, 87 Stat. 24, which became effective on April 20, 1973, set the interest rate on emergency loans at 5%, limited the availability of loans to those unable to obtain credit from other sources, and eliminated entirely the provision that had previously allowed for cancellation of a portion of the principal. A grandfather clause provided that the terms of the earlier act, Pub. L. 92–385, would remain applicable to disasters designated between January 1 and December 27, 1972.

Left unclear, however, was the status of disasters occurring during the 4-month period between December 27, 1972, and April 20, 1973, the effective date of Pub. L. 93–24. Congress resolved this uncertainty by passing Pub. L. 93–237, the provision at the center of this case. Section 4 of the new Act provided that, "[n]otwithstanding the provisions of Public Law 93–24," loans "with respect to natural disasters which occurred" during this interim period would be governed by the more generous terms of Pub. L. 92–385. In addition, § 10(c) provided that the deadline for applying for a loan would be extended 90 days beyond the date of the enactment

of Pub. L. 93–237. This 90-day extension supplanted the established regulatory policy of the Secretary to accept loan applications for crop losses only if filed within nine months of the formal disaster declaration. (For physical losses the deadline was 60 days.) According to the Conference Report, the purpose of the extension was to make sure that the FmHA's "administratively set deadlines" took into account the confusion among farmers concerning the numerous changes in federal disaster relief law in the recent past. S. Conf. Rep. No. 93–363, p. 6 (1973). The bill was signed into law on January 2, 1974. Thus, the congressionally mandated 90-day period for loans under Pub. L. 93–237 expired on April 2, 1974.

The Florida flood coincided with this period of confusion in the administration of federal disaster relief. Between May 26, 1973 (the date the disaster was declared), and January 2, 1974 (the date Pub. L. 93–237 became law), the loan program was administered pursuant to the terms of Pub. L. 93–24. Accordingly, during this initial loan period, farmers had nine months, or until February 26, 1974, to submit applications for emergency loans. At the time of the May 26, 1973, Presidential disaster declaration, and throughout the initial loan period, FmHA rules required the agency to follow certain procedures designed to notify potential borrowers of the availability of disaster relief. 7 CFR § 1832.3(a)(1) (1973). In addition to a general obligation to "make such public announcements as appear appropriate," the regulations required the FmHA County Supervisor to inform various local officials and "agricultural lenders" of "the assistance available under [the] program." *Ibid.*[1] It is undisputed that during the initial loan period no applications were filed.

---

[1] Title 7 CFR § 1832.3 (1973) provides in pertinent part:

"(a) [W]here there is a Presidential major disaster declaration, the National Office will notify the State Director and the Finance Office of the name of the counties . . . eligible for Federal assistance under the declaration, and the period during which [emergency] loans will be made based on

On February 15, 1974, approximately six weeks after the enactment of Pub. L. 93–237, the FmHA issued instructions to its staff concerning the implementation of the new emergency loan program. App. to Pet. for Cert. 48a. Shortly thereafter, the Secretary published these instructions without material change in the Federal Register.[2] 39 Fed. Reg. 7569 (1974) (later codified at 7 CFR §§ 1832.81–1832.92 (1975)). The Federal Register publication set out in detail the terms and conditions of the new program, including the 1% interest rate, the $5,000 forgiveness provision, and the absence of any requirement that the applicant demonstrate the unavailability of other credit. 39 Fed. Reg. 7571 (1974). The regulation also specified that "the termination date for acceptance of applications . . . will be April 2, 1974." *Id.*, at 7570.

Also included in the staff instructions were directions that "State Directors and County Supervisors . . . inform the news media, including newspapers, radio, and television in the affected counties of the provisions of P. L. 93–237." App. to Pet. for Cert. 49a (later published as § 1832.82(a) of the "Special Emergency Loan Policies . . . Implementing Applicable Provisions of Public Law 93–237," 39 Fed. Reg. 7569 (1974)). Attached to the instructions was a suggested news

---

the major disaster. The State Director will notify the appropriate County Supervisors immediately, and instruct them to make [emergency] loans available . . . . The State Director will also notify the State USDA Defense Board Chairman and will make such public announcements as appear appropriate.

"(1) Immediately upon receiving notice about counties under his jurisdiction, the County Supervisor will notify the appropriate County USDA Defense Board Chairman and make such public announcements as appear appropriate about the availability of [loans]. Also, the County Supervisor will explain to other agricultural lenders in the area the assistance available under this program."

[2] Pursuant to 5 U. S. C. §§ 553(b)(B) and (d)(3), the agency dispensed with notice and comment, explaining that any delay in implementing the provisions of Pub. L. 93–237 would be contrary to the public interest. 39 Fed. Reg. 7569 (1974).

release.[3]    App. to Pet. for Cert. 50a–51a.    The release ex-
plained that farmers who had not yet received an emergency
loan could apply for such a loan at the local FmHA office.
Although not setting out the details of the new program, the
model release did state that "loan applications will be taken
under the terms of a new law (P. L. 93–237) enacted January
2, 1974." *Id.*, at 51a.    Consistent with these instructions,
the State FmHA director forwarded the sample news release
to local agency offices.    Those offices in turn sent copies to
the local media, and, on at least two occasions, the releases
were carried in newspapers in the north Florida disaster
area.    Record, Defendants' Exhibits 10–12.    During this
second loan period, that is, the period between the enactment
of Pub. L. 93–237 and the expiration of the 90-day deadline on
April 2, 1974, no more than four farmers from the Florida di-
saster area applied for emergency loans.

On August 19, 1976, respondent Payne, a north Florida
farmer, instituted the present action in the United States
District Court for the Middle District of Florida.    Although
he had received actual notice of the special 1974 emergency
loan program, he sought to represent a class of approxi-
mately 2,500 farmers who had been eligible for loans under
that program but, because of lack of notice, had not been
aware of their eligibility.    Contending that the FmHA's fail-
ure to publicize the program more fully violated the agency's
own regulations and deprived them of property without due
process of law, respondents sought an injunction directing
the FmHA to reopen the loan program under the terms pre-
vailing during the period "up to and including April 2, 1974."
Complaint 6.

The District Court certified the class and granted the re-
quested relief.[4]    In a variety of different ways, the court

---

[3] The publicity directions, but not the model news release, were later
published in the Federal Register, *id.*, at 7570, and the Code of Federal
Regulations, 7 CFR § 1832.82(a) (1975).

[4] The District Court also directed the FmHA to give appropriate notice
of the loan program.    The Secretary concedes that compelling notice was

found, the FmHA had failed to give adequate notice of the availability of loans. Most of the notice deficiencies specifically found by the court occurred during the initial loan period. It found, for example, that a number of farmers had left a June 1973 meeting with the incorrect impression that they were ineligible for loans, that FmHA officials knew of this misimpression, and that they failed to correct it. The court also found that press releases describing the terms of both the initial and new loan programs were incomplete. Finally, the court determined that, in violation of the specific requirements of 7 CFR § 1832.3(a)(1) (1973), the FmHA had failed to notify various state and county officials of the availability of emergency loans. The District Court did not allude to the specific notice requirements promulgated by the agency in connection with the implementation of Pub. L. 93–237. See 39 Fed. Reg. 7569 (1974) (§ 1832.82(a)). Apparently assuming, however, that the earlier notice requirements contained in 7 CFR § 1832.3(a)(1) (1973) continued to apply during the new loan period, the court held that the agency's failure to adhere to these requirements required it to reopen the *new* loan program for a 60-day period extending from April 15, 1981, to June 15, 1981. In particular, the court premised the remedy on the FmHA's failure "to make such public announcements as appear appropriate." *Ibid.*

The Court of Appeals for the Eleventh Circuit affirmed, but on different grounds. *Payne* v. *Block,* 714 F. 2d 1510 (1983). It accepted the District Court's various findings concerning the FmHA's failure to comply with the notice requirements set out in 7 CFR § 1832.3(a)(1) (1973). Those findings, however, "pertain[ed] only peripherally" to its decision to affirm. 714 F. 2d, at 1519. Regardless of any violations of 7 CFR § 1832.3(a)(1), the court concluded, the FmHA had failed to comply with its self-imposed obligation to notify the

---

within the remedial authority of the court if, in fact, adequate notice had not been given previously. The issue is, in any event, moot since all members of respondent class now clearly have notice of the provisions of Pub. L. 93–237.

public of the new loan program. The agency had announced in the Federal Register that it would "inform the news media . . . of the provisions of P. L. 93–237." 39 Fed. Reg. 7570 (1974) (§ 1832.82(a)). This it had not done, the court believed, because the news releases announcing the new loan program had failed to explain its generous terms. In view of the established proposition that agencies are duty bound to adhere to their own procedures, the court held, the most appropriate remedy for the violation was an injunction directing the agency to reopen the loan program. In reaching this conclusion, the Court of Appeals rejected the Government's argument that the April 2, 1974, application deadline was required by an Act of Congress and, therefore, beyond the authority of the District Court to expand. In the court's view, Pub. L. 93–237 had merely required the FmHA to extend its administratively set deadline for 90 days. Nothing in the Act, however, divested the agency of discretion to extend it further.

The Secretary sought review in this Court, and we granted the petition for certiorari, vacated the judgment below, and remanded for reconsideration in light of our decision in *Heckler* v. *Community Health Services of Crawford County, Inc.*, 467 U. S. 51 (1984). *Block* v. *Payne*, 469 U. S. 807 (1984). In *Community Health Services*, the Court held that, even assuming that principles of equitable estoppel ever applied against the Government, "a private party surely cannot prevail [on that theory] without at least demonstrating that the traditional elements of estoppel are present." 467 U. S., at 61. The Court of Appeals, observing that petitioners' liability was premised not on a theory of equitable estoppel but on the agency's failure to follow its own regulations, adhered to its prior views and reinstated its decision. *Block* v. *Payne*, 751 F. 2d 1191 (1985).

Because the decision below exposes the Federal Government to substantial potential liability and because its reasoning implicates important questions about a federal court's

remedial powers, we again granted certiorari. *Block* v. *Payne*, 474 U. S. 815 (1985). We now reverse.

## II

The Secretary's principal argument in this Court is that the remedy granted below shares all of the essential characteristics of an equitable estoppel against the Government and, accordingly, should be analyzed on those terms. We acknowledge that the practical effect of the injunction requiring the reopening of the loan program is to estop the FmHA from relying on the validly promulgated regulatory deadline as a basis for refusing to process further loan applications.[5] And we readily agree that, had respondents sought relief on an equitable estoppel theory, they could not prevail. As we observed only recently, even assuming that the Government is ever subject to estoppel, a "private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present." *Heckler* v. *Community Health Services of Crawford County, Inc.*, 467 U. S., at 61. An essential element of any estoppel is detrimental reliance on the adverse party's misrepresentations, *id.*, at 59 (citing 3 J. Pomeroy, Equity Jurisprudence § 805, p. 192 (S. Symons ed. 1941)); and neither the named plaintiffs, much less the 2,500 members of the class they represent, have sought to demonstrate such reliance. Moreover, the only misconduct specifically found by the District Court was the failure to give effective notice of information that, at least with respect to the second loan period, was concededly published in the Federal Register. Our cases leave no doubt that "failure to fully publicize the rights . . . accorded" by an Act of Congress does not "give rise to an estoppel against the Government." *INS*

---

[5] The Secretary has abandoned his claim that the statute itself expressly disabled the Secretary from extending the deadline beyond April 2, 1974. See S. Conf. Rep. No. 93–363, p. 6 (1973) (describing Pub. L. No. 93–237 as requiring the Secretary to "extend" the "administratively set deadlin[e]" by 90 days).

v. *Hibi*, 414 U. S. 5, 8–9 (1973) *(per curiam)*.  See also *Heckler* v. *Community Health Services of Crawford County, Inc., supra*, at 63 ("[T]hose who deal with the Government are expected to know the law"); *Federal Crop Ins. Corp.* v. *Merrill*, 332 U. S. 380, 384 (1947).

As the Court of Appeals correctly observed, however, respondents' inability to satisfy the stringent requirements of common-law estoppel does not independently decide the case. Indeed, beginning with their initial complaint and throughout the course of the litigation, respondents have never sought to rely on estoppel as a basis for recovery.  Their theory instead, and the theory on which the lower courts granted the injunction, is that the Administrative Procedure Act (APA), 5 U. S. C. § 551 *et seq.*, authorizes this kind of relief to remedy the FmHA's alleged failure to comply with its duly promulgated notice regulations.  It may well be that some of the same concerns that limit the application of equitable estoppel against the Government bear on the appropriateness of awarding other remedies that have a close substantive resemblance to an estoppel.  We reject, however, petitioners' suggestion that any remedy that can be analogized to an equitable estoppel is necessarily invalid, regardless of the source of the cause of action, unless the plaintiff succeeds in proving all the elements of common-law estoppel.  Cf. *Honda* v. *Clark*, 386 U. S. 484, 494–495 (1967).  Indeed, any other rule has the potential for divesting the courts of the remedial authority specifically envisioned by Congress under the APA.  If, for example, a farmer had filed a loan application prior to the expiration of the loan deadline and a court determined that the denial of the application after the deadline's expiration was "arbitrary, capricious [and] not in accordance with law," 5 U. S. C. § 706(2)(A), the appropriate remedy under the APA would be to direct that the application be granted or reconsidered.  Although this would, in a sense, estop the Government from applying the deadline, we have never suggested that the applicant would be under an

obligation to satisfy the requirements of proving an equitable estoppel to obtain the relief specifically available under the APA.

The question before us then is not whether the Secretary should be estopped from applying the deadline, but whether the relief afforded by the District Court was appropriate under the APA. Respondents contend that the notice regulations, having been promulgated pursuant to the Secretary's delegated rulemaking authority, had the force and effect of law and therefore were binding on the agency. To remedy this noncompliance, they suggest, the District Court had the authority under 5 U. S. C. § 706 to "compe[l] 'action unlawfully withheld' [notice] and 'set aside agency action' [application of the deadline] found to be 'without observance of procedures required by law.'" Brief for Respondents 21 (quoting 5 U. S. C. § 706) (bracketed material in original).

To prevail on this theory, respondents must clear at least three substantial hurdles. At the outset, not all agency publications are of binding force, *Schweiker* v. *Hansen,* 450 U. S. 785, 789 (1981); and it remains to be shown that the notice provisions, which began life as unpublished staff instructions, are the kind of agency law the violation of which is remediable at all. Second, an agency's power is no greater than that delegated to it by Congress. Thus, even assuming that Pub. L. 93–237 left the Secretary some discretion to extend the 90-day deadline beyond April 2, 1974, it would hardly be an abuse of that discretion to refuse to do so many years after the disaster had receded if such an extension would be inconsistent with the intent of Congress. Finally, the "agency action" respondents seek to have set aside is the "application of the deadline." Yet, with the exception of respondent Payne, who clearly has no standing,[6] there is no

---

[6] Because Payne had actual notice of the new loan program and actually applied for a loan, the Secretary argued in the Court of Appeals that Payne lacked standing to complain that the publicity was inadequate. The Court of Appeals granted a limited remand, and the District Court entered an

allegation that any member of the class has ever applied for a loan. Although the APA includes "failure to act" in its definition of reviewable agency action, 5 U. S. C. §551(13), it is far from clear that relief under the APA is appropriate when the allegedly aggrieved party has failed entirely to present its claim to the agency. Cf. *Mathews* v. *Eldridge*, 424 U. S. 319, 328 (1976).

We need not, however, definitively resolve any of these issues. Nor need we confront the Secretary's broader contention that it is in all instances inappropriate for a court, reviewing for agency compliance with the APA, to set aside one validly promulgated regulation to remedy an alleged violation of another entirely independent one. An essential predicate of the relief granted below is that the FmHA in fact failed to comply with its own rules. As we now explain, the Court of Appeals' conclusion that the FmHA violated its self-imposed obligation to give notice of the loan program is insupportable.

The Court of Appeals relied exclusively on the FmHA's purported violation of § 1832.82(a), the new notice provision, to uphold the injunction directing the Secretary to reopen the loan program. Although the agency did issue press releases, the court reasoned, its failure to describe the generous terms of the new program breached its regulatory obligation to " 'inform the news media . . . of the *provisions* of P. L. No. 93–237.' " 714 F. 2d, at 1520, quoting 39 Fed. Reg. 7570 (1974) (emphasis supplied by Court of Appeals).

This reasoning is demonstrably incorrect. Public Law 93–237 itself said nothing at all about the availability of a reduced interest rate, the possibility of partial forgiveness of the loan principal, or the elimination of the requirement that credit be unavailable from other sources. It merely stated that "[n]otwithstanding the provisions of Public Law 93–24," loans with respect to disasters occurring prior to April 20, 1973, would

---

amended final judgment naming as class representative another class member who allegedly had not received notice of the program. App. to Pet. for Cert. 46a–47a.

be administered under Pub. L. 92–385. Thus, the statement in the news release that "loan applications will be taken under the terms of a new law (P. L. 93–237) enacted January 2, 1974," though not a model of clarity, was no less informative than were the "provisions" of the Act the release was endeavoring to describe. App. to Pet. for Cert. 51a; 7 CFR § 1832.82(a) (1975).

Moreover, the Court of Appeals' holding runs roughshod over the established proposition that an agency's construction of its own regulations is entitled to substantial deference. *United States* v. *Larionoff,* 431 U. S. 864, 872 (1977); *Udall* v. *Tallman,* 380 U. S. 1, 16–17 (1965). The publicity directive that was later codified at 7 CFR § 1832.82(a) (1975) was originally issued as a staff instruction designed to describe the procedures for implementing Pub. L. 93–237. App. to Pet. for Cert. 48a–49a. Accompanying the instruction was a sample press release identical in all pertinent respects to those sent to the media in the area of the Florida disaster. *Id.,* at 50a–51a. Because the suggested release obviously reflected the agency's contemporaneous understanding of the scope of the publicity directive, it is logically untenable to suggest that the agency violated the directive by issuing press releases modeled explicitly on the sample.

The Court of Appeals specifically disclaimed any reliance on 7 CFR § 1832.3(a)(1) (1973), the Secretary's previous publicity directive, to support its affirmance of the District Court's judgment. As they are entitled to do, however, respondents now defend that judgment on the alternative theory that the agency's violation of this earlier notice provision warranted the remedy of an injunction reopening the loan program. We find this theory no more supportable than that relied on by the Court of Appeals. As an initial matter, any violations of this regulation that occurred during the first loan period are plainly irrelevant. Starting with their complaint, and throughout the course of this lengthy litigation, respondents have sought to have the loan program reopened

under the more generous terms available under Pub. L. 93–237. And such was the relief granted by the District Court. App. to Pet. for Cert. 45a. As a simple matter of causation, any failure to inform respondents about the old loan program cannot support the remedy of requiring the FmHA to process loan applications under the "terms and benefits" available under the new one. *Ibid.*

Nor do we believe that any noncompliance with the terms of 7 CFR § 1832.3 during the second loan period would justify the District Court's remedy.[7] Although the District Court did find that this provision had been violated during the initial loan period, it is far from clear from the face of its opinion that it found any such violations during the second period. Even assuming such findings, however, we agree with the conclusion of the Court of Appeals for the Ninth Circuit that the notice provisions of 7 CFR § 1832.3 were no longer applicable during the period after the enactment of Pub. L. 93–237, at least with respect to disasters declared prior to the date the new law came into force. See *Emergency Disaster Loan Assn., Inc.* v. *Block,* 653 F. 2d 1267, 1270 (1981).

By its terms, § 1832.3(a) requires only notice of the loan program in place at the time of the Presidential disaster declaration. See also § 1832.92 (1975) (describing § 1832.3 as

---

[7] JUSTICE STEVENS makes much of the fact that the new regulation was not issued until February 27, 1974, several weeks after Pub. L. 93–237 was signed into law. In his view, this delay violated the command of § 1832.3(a) to provide notice "immediately." This reasoning is flawed in several respects. First, it entirely ignores our conclusion that, by its terms, § 1832.3 was simply inapplicable to the new loan program. Second, even if somehow applicable, § 1832.3 requires the State Director to provide "immediat[e]" notification to County Supervisors only *after* he himself has received notice from the "National Office"; and it is undisputed that the Secretary did not issue staff instructions until February 15, 1974. Finally, it is far from clear that a time lag of a mere few weeks between the enactment of a new law and the issuance of implementing regulations fails to qualify as "immediate" action within the meaning of the pertinent regulation.

setting out procedures for reporting natural disaster designations). Accordingly, its plain language casts serious doubt on respondents' assumption that it was also intended to serve as a means of giving notice of midcourse changes in the terms of the loan program long after the disaster had been declared.

Any ambiguity about the regulation's reach is dispelled by the history of Pub. L. 93–237 itself. As the Court of Appeals recognized, Congress was acutely aware of confusion in the administration of the Nation's disaster relief laws when it enacted Pub. L. 93–237. 714 F. 2d, at 1516–1517. S. Conf. Rep. No. 93–363, p. 6 (1973). A central objective of the new Act was to correct this confusion by clarifying the credit terms available during this period and by requiring the Secretary to extend the application deadline to compensate for prior "uncertain[ties]" in the law. *Ibid.* Consistent with that objective, the Secretary announced in the Federal Register the new procedures the agency would follow to "implemen[t] applicable provisions of Public Law 93–237." 39 Fed. Reg. 7569 (1974). These procedures, which included the notice provision later codified at 7 CFR § 1832.82(a), were designed to "supplemen[t] and modif[y]" the procedures that had been in place under the old regime, including 7 CFR § 1832.3(a). While this language is ambiguous, the regulatory history strongly suggests that in adopting notice procedures specifically geared to the new law, the Secretary intended for those procedures to be the principal mechanism for spreading the word about Pub. L. 93–237 in areas in which a disaster had already been declared. Aware of Congress' belief that prior efforts to implement the old program had failed, this history suggests, the Secretary sought to take a different tack to assure effective implementation of the new one—notification of the media pursuant to § 1832.82.

This interpretation is confirmed by § 1832.92, also adopted as part of the FmHA's efforts to implement Pub. L. 93–237. 39 Fed. Reg. 7575 (1974). There, the Secretary specifically provided that for any "new" disaster designations, notice

should be given pursuant to § 1832.3. There is no mention whatever of § 1832.3 in the balance of the regulations dealing with disasters that had already been declared at the time the regulation was published. A fair inference from this omission is that for disasters, such as the Florida flood, that had already been declared at the time of the enactment of Pub. L. 93–237, the Secretary intended that § 1832.82(a), rather than § 1832.3, provide the appropriate mechanism for notifying affected farmers about the new loan program. Accordingly, any failure to follow the old notice provisions during the second loan period was entirely consistent with the Secretary's intended approach and provides no permissible basis for ordering the new program reopened.

## III

We conclude, therefore, that the lower courts erred in holding that the Secretary's conduct violated the only notice procedures relevant to the implementation of Pub. L. 93–237. Accordingly, even assuming, *arguendo*, that reopening the loan program would have been an appropriate remedy had the relevant regulations been violated, awarding that relief was clearly improper in light of the FmHA's compliance with its own procedures. Nor can the relief be supported on the theory, not addressed by either court below, that inadequate notice of the loan program deprived respondents of property without due process of law. We have never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause of the Fifth or Fourteenth Amendment. *Walters* v. *National Assn. of Radiation Survivors*, 473 U. S. 305, 320, n. 8 (1985). Even on the assumption that they do, however, the notice published in the Federal Register, as well as that afforded by the Secretary in full compliance with his own procedures, was more than ample to satisfy any due process concerns. See 44 U. S. C. § 1507 (Publication in

Federal Register "is sufficient to give notice of the contents of the document to a person subject to or affected by it").

Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

When Congress enacts a generous program to provide relief for the victims of a natural disaster, the Secretary of Agriculture has a duty to implement that program in the spirit which motivated its enactment even if he believes a more parsimonious policy will serve the national interest. On January 2, 1974, Congress enacted such a program to benefit, among others, the Florida farmers who had suffered serious losses as the result of a disaster that the President had declared on May 26, 1973. Pub. L. 93–237. On the date the statute was enacted, as well as the date of the disaster and the date of the President's declaration, regulations were in place that required the Department to give appropriate notice to the State Director, the appropriate county officials, the agricultural lenders in the area, and the public. See 7 CFR § 1832.3(a) (1973). *Ante,* at 930–931, n. 1. The regulations plainly stated that effective notice should be given "immediately."

The District Court found—and the Court does not disagree—that the Secretary failed to comply with § 1832.3(a). For several weeks after the enactment of the statute, the Secretary took no public action. On February 27, he promulgated a new announcement—which was explicitly intended to "supplement" the existing notice regulations—requiring that advice be given to the news media. Pursuant to that announcement, an ambiguous and uninformative news release was prepared and distributed. The Court nevertheless holds that (1) the release complied with the supplementary regulation issued on February 27 and (2) the supplementary regulation somehow superseded the specific § 1832.3(a) notice provisions which were already in place when the

statute was enacted. These holdings, I submit, misread the regulations and are not faithful to the intent of the Congress that enacted the governing statute.

Before explaining in greater detail why I agree with the District Court and the Court of Appeals' findings concerning the Secretary's flagrant violation of the notice regulations, I shall briefly comment on the timeliness of the action and the Court's correct rejection of the Government's primary challenge to the propriety of that remedy.

## I

This litigation was commenced on August 19, 1976. In the Court of Appeals, the Secretary contended that the action was not timely because the emergency loan program authorized by Pub. L. 93–237 expired on April 2, 1974. The Court of Appeals held, however, that "where, as here, exigent circumstances beyond the farmers' control precluded intended beneficiaries from applying for loans, the agency had the power to extend the loan period and the District Court was within its power in ordering the agency to do so. To hold otherwise would allow the FmHA to totally fail to provide notice to congressionally intended potential beneficiaries and avoid being called to task for such conduct." *Payne* v. *Block*, 714 F. 2d 1510, 1517 (CA11 1983).[1] In this Court, the Secretary has abandoned his claim that he had no power to extend the deadline for loan applications. *Ante*, at 935, n. 5.

The Secretary has argued, however, that the remedy ordered by the District Court was improper because it rested on an equitable estoppel theory. The Court today correctly—and unanimously—rejects this argument, thus answering the central question of law that prompted it to grant

---

[1] In a footnote, the Court of Appeals added:

"We emphasize that Congress had previously invoked, and 'expected' FmHA would invoke, a similar reopening remedy in 93–237 when potential beneficiaries of the program were confused as to the program's terms." 714 F. 2d, at 1517, n. 26.

certiorari in a way that completely repudiates the submission of the Solicitor General.[2] Thus, neither the doctrine of estoppel nor the passage of time since the emergency loan program's administrative deadline was authorized has any bearing on the question that controls the outcome of the case. That question is whether the Secretary provided the intended beneficiaries of the emergency loan program with the notice that was required by law. The question is best answered after briefly describing the historical context in which it arose.

## II

In 1972 and 1973, the Secretary of Agriculture took the position that he was not obligated to implement emergency loan programs authorized by Congress if he thought it was unwise

---

[2] The only "Question Presented" by the Solicitor General in the Government's certiorari petition was the following: "Whether the Secretary of Agriculture *may be equitably estopped* from enforcing a valid regulation establishing a deadline for filing of applications for Farmers Home Administration emergency loans on the ground that the agency's news release announcing the availability of loans did not specify the generous terms of the program." Pet. for Cert. I (emphasis added).

To its credit, in rejecting the Government's equitable estoppel argument, the Court belatedly acknowledges that it unnecessarily prolonged this litigation by vacating the first judgment entered by the Court of Appeals in 1983 and remanding for further consideration in the light of our decision in *Heckler* v. *Community Health Services, Inc.*, 467 U. S. 51 (1984). See *Block* v. *Payne*, 469 U. S. 807 (1984).

In light of the possible incongruity of considering this challenge 13 years after the natural disaster that triggered the loan obligations, moreover, it is important to emphasize that there has been no suggestion of dilatoriness by respondents. For unexplained reasons, the case took five years before it reached trial. Since then, it has been the Government that has prolonged the proceedings every step of the way—by appealing to the Court of Appeals; by asking this Court to dispose of the case in light of an equitable estoppel case; and by seeking certiorari again after the Court of Appeals correctly noted the inapplicability of the estoppel doctrine. Thus, the unusual length of time between the original program and our consideration of it is irrelevant; to the extent that it is relevant, the Government bears the responsibility for almost all of the delay.

to do so.[3]  His position was consistent with administration policy concerning other programs authorized by Congress at that time.  See *Train* v. *City of New York*, 420 U. S. 35 (1975); *Berends* v. *Butz*, 357 F. Supp. 143 (Minn. 1973).  As a consequence of this fundamental disagreement between the Secretary and Congress, two legislative measures were adopted that provide the background for this case.  First, in response to the Secretary's view that the then existing emergency loan programs were too generous, Congress made three important changes in the programs effective on April 20, 1973.  It increased the interest rates from one percent to five percent; it denied eligibility to farmers who could obtain credit elsewhere; and it discontinued the practice of forgiving $5,000 of the principal indebtedness.  Thus, after April 20, 1973, the emergency loans were considerably less attractive than they had been before.

Second, after several months of uncertainty as to whether the old or the new terms applied to disasters during the period in which this case arose, Congress adopted Pub. L. 93–237 for the specific purpose of making the earlier, more generous loan terms available to a specific class of farmers, including those in northern Florida, who suffered severe crop losses as a result of a specific disaster.  Thus, respondent farmers had two opportunities to apply for emergency loans—between May 26, 1973, and January 2, 1974, at the higher rate, and between January 2, 1974, and April 2, 1974, at the more favorable rate.

Throughout this period—and for several years thereafter—the Secretary's regulations provided a detailed procedure for giving notice "immediately" to the appropriate County Supervisors and requiring the State Directors to

---

[3] See Impoundment of Appropriated Funds by the President: Joint Hearings before the Ad Hoc Subcommittee on Impoundment of Funds of the Senate Committee on Government Operations and the Subcommittee on Separation of Powers of the Senate Committee on the Judiciary, 93d Cong., 1st Sess., 532 (1973) (testimony of Secretary Butz).

make "such public announcements as appear appropriate."[4] The District Court found, and the Court of Appeals agreed, that the Secretary not only failed to comply with this provision, but actually disseminated a good deal of misinformation. Thus, for example, the State Director advised the County Supervisors, in information intended for public release, that applications had to be filed prior to July 30, 1973—which was correct for loans relating to physical damage—but totally omitted any reference to the fact that the deadline for production loss loans was several months later. In my opinion, however, the more important violations were those that occurred during the second application period—after January 2, 1974, when Congress authorized loans at an interest rate of one percent and on terms that it is difficult to believe any informed and eligible farmer would have refused.

## III

The notice regulations that were in effect during the first application period remained in effect during the 90 days after the enactment of Pub. L. 93–237 on January 2, 1974.[5]  Not-

[4] At all relevant times the Code of Federal Regulations contained the following provisions:

"(a) . . . The State Director [of the FmHA] will notify the appropriate County Supervisors immediately and instruct them to make EM loans available under § 1832.13.  His notification will be confirmed by State requirements issued as soon as possible.  The State Director will also notify the State USDA Defense Board Chairman and will make such public announcements as appear appropriate.

"(1) Immediately upon receiving notice about the counties under his jurisdiction, the County Supervisor will notify the appropriate County USDA Defense Board Chairman and make such public announcements as appear appropriate about the availability of EM loans under § 1832.13. Also, the County Supervisor will explain to other agricultural lenders in the area the assistance available under this program."  7 CFR § 1832.3(a)(1) (1973).

[5] Although the majority concludes that the regulation did not apply to Pub. L. 93–237, it does not contest that the § 1832.3 regulation, detailing the required procedure for administering emergency loans, remained in effect during the pertinent period.

withstanding the dramatic change in the loan terms author-
ized by that Act, no notice of any kind was published in the
Federal Register—or anywhere else—until February 27,
1974, when two-thirds of the reopened application period had
already expired. This complete silence for a period of almost
two months was unquestionably a plain violation of the regu-
lations' command—if the regulations were, in fact, appli-
cable—that the "State Director will notify the appropriate
County Supervisors *immediately* . . . and will make such
public announcements as appear appropriate." 7 CFR
§ 1832.3(a)(1) (1973) (emphasis added).

On February 27, 1974, the Secretary did publish the condi-
tions of the new program in the Federal Register, and also
supplemented the existing notice regulation with the publica-
tion of staff instructions that State Directors and County Su-
pervisors should inform the news media of the provisions of
Pub. L. 93–237. See 39 Fed. Reg. 7569–7571.

It is thus perfectly clear that the Secretary did not comply
with the § 1832.3(a) notice regulations that were in effect
when Pub. L. 93–237 was enacted. The Court does not dis-
agree with this conclusion. Rather, it takes the remarkable
position that the failure to follow those notice provisions is ir-
relevant because the Secretary did comply with the instruc-
tions promulgated in February. This reasoning is severely
flawed.

First, the Court's conclusion does not accord with the lan-
guage and structure of the February 27 notice provisions.
Nothing in these new staff instructions stated or implied that
they were intended to replace or to withdraw any of the pre-
existing notice procedures. Instead, the published notice
explicitly stated that the publication of the new provisions
"supplements and modifies" the existing regulations, includ-
ing § 1832.3(a). 39 Fed. Reg. 7569 (1974). "Supplement-
ing" and "modifying" are hardly words that suggest the kind
of wholesale obliteration envisioned by the majority.[6]

---

[6] Indeed, as the Court points out, *ante*, at 941–942, another of the
requirements promulgated on February 27 specifically referred to the

Second, under the Court's own logic, § 1832.3(a) should have been fully applicable for the first two months of the second loan period. If, as the Court suggests, it was the February 27 Federal Register publication that superseded the existing regulations with respect to Pub. L. 93–237, then presumably the earlier regulations were fully in force until then. Yet the Court flatly states that § 1832 simply was inapplicable in the second loan period—even for the significant amount of time in which the "superseding" regulation was not in place.

Finally, the Court's analysis conflicts with the obvious purpose of Congress in passing Pub. L. 93–237. If the new instructions are given the construction that the Court accepts today, they enabled the Secretary to defy or ignore the will of Congress just as effectively as when he simply refused to make emergency loans on the terms authorized by Congress. Given the fact that regulations requiring adequate notice were in effect at the time Congress adopted a special statute to benefit the victims of specific disasters already declared by the President, surely the Secretary had a duty to comply with the pre-existing regulations during the 90-day period specified in the Act. To conclude otherwise, as the Court does, has an anomalous result. Under the Court's analysis, Congress, in liberalizing and extending the loan program, also created some kind of Bermuda Triangle that made blatant violations of the longstanding § 1832.3(a) notice requirements mysteriously disappear and have no legal effect. Indeed, the incongruous consequence of the Court's reasoning is that, if Congress had never passed the new statute, the Secretary would have continued to be bound by the extensive

§ 1832.3 requirements. See 39 Fed. Reg. 7575 (1974), codified at 7 CFR § 1832.92 (1975) ("Instructions for handling new designations will be forthcoming. In the meantime, natural disasters should be reported and designation requests submitted in accordance with the procedure set forth in § 1832.3"). Far from "confirm[ing]" that the § 1832.3 requirements were now *inapplicable* to already designated disasters, that regulation supports a view that the new regulations were intended merely to supplement the pre-existing § 1832.3 requirements.

§ 1832.3 notice provisions in January and February 1974. For those months would have been within the original loan period. By extending the period and making the terms more favorable, however, Congress somehow vitiated—or permitted the Secretary to vitiate—those notice provisions for the months and program in question.

Thus, the majority's conclusion that § 1832.3(a) did not apply to the Secretary's administration of Pub. L. 93–237 is erroneous.

I also disagree with the majority's conclusion that the Secretary's efforts satisfied the February 27 notice requirements, which were later codified at 7 CFR § 1832.82 (1975). Those duly promulgated requirements unequivocally stated a mandatory obligation: "State Directors and County Supervisors will inform the news media including newspapers, radio, and television in the affected counties of the provisions of P. L. 93–237." 39 Fed. Reg. 7570 (1974). The Secretary does not argue that the single publication of the emergency loan terms in the Federal Register itself constituted compliance with this duty. His claim of compliance during the second application period also rests on the preparation and distribution of a news release. That release, however, did not disclose the loan terms that were authorized by Pub. L. 93–237. Indeed, the only reference to the new statute, the "provisions" of which the Department had a mandatory obligation to explain, was the following: "These loan applications will be taken under the terms of a new law (P. L. 93–237) enacted January 2, 1974." App. to Pet. for Cert. 57a.

An instruction to inform the news media "of the provisions of P. L. 93–237" surely should be construed to require that the news media be informed of the loan terms that the statute authorized.[7] Such a construction would reflect, not an inter-

---

[7] Because Pub. L. 93–237 authorized the generous terms by reference to the earlier statute in which they were spelled out in detail rather than by repeating them in the text of Pub. L. 93–237 itself, the Court states that

pretation that "runs roughshod over the established proposition that an agency's construction of its own regulations is entitled to substantial deference," *ante*, at 939, but a simple adherence to the regulation's "plain language." Cf. *Young* v. *Community Nutrition Institute, post*, p. 974. It is therefore clear that the new § 1832.82 requirements also were not followed.

In short, the Secretary followed neither the pre-existing § 1832.3 requirements nor the newly promulgated § 1832.82 requirements. The effect was predictable. Although thousands of farmers were eligible for the program, no more than four received loans. As a result, although Congress had shown its intense commitment to this program by repeatedly legislating and by honing the program in an attempt to overcome executive intransigence, the sustained congressional efforts went for naught.[8]

the press release "though not a model of clarity, was no less informative than were the 'provisions' of the Act the release was endeavoring to describe." *Ante*, at 939. This is a disturbingly cavalier approach to the duty to give appropriate notice to the farmers that Congress was trying to help. Moreover, it is not even accurate because the release did not mention the fact that the program that had been available under prior legislation was again being made available. Without either a mention of the actual terms or the fact that the earlier program was being revived, the press release was virtually meaningless, and certainly less informative than the statute itself.

[8] In view of the majority's statement that the "Court of Appeals specifically disclaimed any reliance on 7 CFR § 1832.3(a)(1) (1973) . . . to support its affirmance of the District Court's judgment," *ante*, at 939, it bears emphasis that the Court of Appeals disclaimed such reliance only because it found the violation of § 1832.82 so patent:

"FmHA failed to comply with federal regulations specifically designed to transmit notice of available emergency loan programs to the *public*. FmHA made no loans during the initial application period and only a handful during the renewed period. . . .

"In light of FmHA's failure to comply with specific prescriptions for notice, we find it unnecessary to determine whether FmHA provided 'such public announcements as appear appropriate' or whether in fact such a requirement is judicially reviewable. We do note, however, the paucity of

## IV

In my opinion, the Court's holding allows an executive agency far too much discretion to disregard the plain intent of Congress. The Secretary did not implement the program authorized by Pub. L. 93–237 in the spirit in which it was enacted. "As conceived and passed in both Houses, the legislation was intended to provide a firm commitment of substantial sums within a relatively limited period of time in an effort to achieve an early solution of what was deemed an urgent problem. We cannot believe that Congress at the last minute scuttled the entire effort by providing the Executive with the seemingly limitless power to withhold funds from allotment and obligation." *Train* v. *City of New York*, 420 U. S., at 45–46. The failure to advise the farmers of the congressionally mandated loan provisions was merely a variant of the theme repudiated in *Train*.

I would affirm the judgment of the Court of Appeals.

---

public announcement during both the initial and reopened application periods. Especially is this continual dearth of public notice noteworthy where the state director testified that he and his staff were 'flabbergasted' at the lack of response to the emergency loan program. . . .

.          .          .          .

"Our review of the record convinces us that the district court was not clearly erroneous in its six pages of findings of fact and that it was correct in its ultimate conclusion of insufficient notice." *Payne* v. *Block*, 714 F. 2d 1510, 1519–1520 (CA11 1983) (footnote omitted).