**PUERTO RICO ELECTRIC POWER AUTHORITY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

American Paper Institute, Inc., American Gas Association, Cogeneration Coalition of America, Inc., Brooklyn Union Gas Co., Electricity Consumers Resources Council, Alcon, Inc., Energy Michigan, Inc., Intervenors.

No. 87–1219.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 18, 1988.

Decided June 3, 1988.

Nicholas W. Fels, with whom Elliott Schuler, Washington, D.C., was on the brief, for petitioner.

Jerome M. Feit, Sol., F.E.R.C., with whom Catherine C. Cook, Gen. Counsel and Joseph S. Davies, Atty., F.E.R.C., Washington, D.C., were on the brief, for respondent.

Adam Wenner, Howard E. Shapiro, Washington, D.C., for Alcon, Inc.

Rigdon H. Boykin, New York City, Robert F. Shapiro, Washington, D.C., for American Paper Institute, Inc.

Kevin B. Belford and Carol A. Smoots, Arlington, Va., for American Gas Ass'n.

Mary Ann Walker, Washington, D.C., for Cogeneration and Independent Power Coalition of America, Inc.

John W. Pestle, Grand Rapids, Mich., for Energy Michigan, Inc.

Philip A. Fleming, Washington, D.C., for Electricity Consumers Resource Council and David Konick, Washington, D.C., for Brooklyn Union Gas Co., were on the joint brief for intervenors.

Amy S. Koch, Washington, D.C., also entered an appearance for intervenor, American Paper Institute, Inc.

David J. Muchow, Arlington, Va., also entered an appearance for intervenor, American Gas Ass'n.

M. Lisanne Crowley, Washington, D.C., also entered an appearance for intervenor, Electricity Consumers Resources Council.

Before WILLIAMS and D.H. GINSBURG, Circuit Judges, and DANNY J. BOGGS*, Circuit Judge, for the U.S. Court of Appeals for the Sixth Circuit.

Opinion for the Court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

"Cogeneration" involves the joint production of electricity and useful heat or steam, in circumstances where some or all of the heat would otherwise be dissipated into the environment. Congress in 1978 was persuaded that artificial factors had prevented the nation from fully realizing cogeneration's potential. One such impediment was the likely refusal of electric utilities to deal with enterprises producing electricity through cogeneration: to sell back-up electricity to firms relying on cogeneration, or

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

to buy electricity that was surplus to a cogeneration project. Accordingly, in § 210(a) of the Public Utility Regulatory Policies Act of 1978 ("PURPA"), Pub.L. No. 95–617, 92 Stat. 3144, 16 U.S.C. § 824a–3(a) (1982 & Supp. V 1987), Congress directed the Federal Energy Regulatory Commission to prescribe rules under which electric utilities would be required to enter such transactions with "qualifying cogeneration facilities" (often referred to as "QFs"). *See* Mark Lennon & David Meyers, *Net Energy Use Impacts of PURPA Implementation,* PUB. UTIL. FORT., May 12, 1988, at 28–38 (finding considerable benefits in QF program).

We deal here with application of § 210 to a cogeneration arrangement that involves separate ownership of its producing and consuming aspects. Under a lease agreement, O'Brien Energy Products, Inc. will supply electricity and non-electric energy to Alcon (Puerto Rico), Inc., the owner and operator of a pharmaceutical manufacturing plant in Humacao, Puerto Rico. O'Brien and Alcon are separate corporations, evidently not affiliated. Under the lease, O'Brien has sole responsibility for constructing, operating, and maintaining the facilities that produce electricity and other energy. O'Brien also leases those facilities to Alcon in exchange for "rent payments" based not on time but on energy output (kilowatt hours for electricity and BTUs for chilled water) at rates based on those charged by the Puerto Rico Electric Power Authority ("PREPA"). At the end of the agreement's five-year span, Alcon is given the option of renewing the lease, purchasing the facility for its residual value, or requiring O'Brien to remove the facility from its property. The arrangement between Alcon and O'Brien is apparently designed to take advantage of financing and tax advantages which would be unavailable if Alcon owned and operated the cogeneration facility itself.

PREPA here resists the Commission's decision that Alcon should enjoy the benefits established under § 210. It urges a narrow interpretation of the statutory term "qualifying cogeneration facilit[y]," and more persuasively, of the Commission's im-

plementing regulations. PREPA also argues that the Commission failed to find that Alcon itself is a QF. Its arguments are not wholly implausible. If accepted, however, they would open a serious gap in the fulfillment of Congress's evident intention, and accomplish nothing that Congress sought. Not surprisingly, we reject them and deny the petition for review.

The Commission's decision in favor of Alcon was not its first pass at the issue. When we address the merits of PREPA's claims we will consider the various analyses offered in the many opinions the case has provoked. For now we simply identify them. Originally the Commission denied Alcon's request for certification as a qualifying facility, *Alcon (Puerto Rico), Inc.,* 32 FERC ¶ 61,247 (1985) ("*Alcon I*"), *reprinted in* Joint Appendix ("J.A.") at 233–42, in essence on the view that only the electricity-producing element of the project qualified as such. Commissioner Stalon issued an emphatic dissent, arguing that both the producing and consuming components of such a project should enjoy the § 210 entitlement. Alcon and eleven intervenors sought rehearing and prevailed; the Commission adopted the substance of Commissioner Stalon's view. *Alcon (Puerto Rico), Inc.,* 38 FERC ¶ 61,042 (1987) ("*Alcon II*"), *reprinted in* J.A. at 557–71. Commissioner Trabandt wrote a concurring opinion under which the decision would be limited to the specific facts of the case, and future applicants would be required to demonstrate a "close nexus" between their production and consumption components in order to qualify. Commissioner Sousa dissented, adhering to the Commission's original view. Finally, PREPA sought rehearing, which the Commission rejected. *Alcon (Puerto Rico), Inc.,* FERC No. QF84–147–010 (March 26, 1987) ("*Alcon III*"), *reprinted in* J.A. at 468–72. The rejection entailed a new round of opinions, largely but not completely duplicating those of the second round.

I. THE COMMISSION'S FAILURE TO CERTIFY ALCON AS A QUALIFYING COGENERATION FACILITY

PREPA characterizes the Commission's order as "constru[ing] the statute as re-

quiring utilities to sell electricity to entities that are not themselves QFs." Petitioner's Brief at 16. If the order so provided, it would violate the statute. Providing some support for petitioner is a line in *Alcon III*, stating that *Alcon II* "did not find that Alcon's pharmaceutical plant was a QF or that Alcon would own or operate a QF." J.A. at 469. Whatever the exact meaning of the phrase, we do not believe it undercuts the Commission's plain finding that Alcon was the consuming *component* of a unified qualifying cogeneration project. As we will spell out below, we can adequately discern the tracks of the Commission's reasoning. *See Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C.Cir.1970) (agency findings of "less than ideal clarity" may be upheld "if the agency's path may reasonably be discerned"), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

In *Alcon II*, FERC employed the term "projects" to encompass the producing and consuming "functions" of the facilities it believed to be eligible under § 210. Thus it spoke of "projects" that "have separate corporate ownership of production and consumption functions," J.A. at 426, and said that such separate ownership should not "*per se* preclude qualifying cogeneration projects from receiving back-up power," *id.* *See also id.* ("[T]he Section 210 right to back-up power covers both the production and consumption functions, irrespective of whether they have the same ownership"). Commissioner Trabandt's concurrence in *Alcon II* used a similar terminology, taken directly from Commissioner Stalon's dissent in *Alcon I*, referring to Alcon's and O'Brien's facilities "compris[ing] the production and consumption functions of the typical [qualifying facility]." *Id.* at 433.

On other occasions the Commission or separate opinion writers used the term "facility" to refer to both the producing and consuming components and to the aggregate. Thus the Commission agreed with Alcon that

> neither the legislative history of PURPA nor sections 201 and 210 appear to indicate that Congress intended to distinguish qualifying facilities on the basis of

separate versus single ownership of production and consumption facilities for purposes of determining entitlement to back-up power.

*Alcon II*, J.A. at 427 n. 6. *See also id.* at 425 (quoting regulations recognizing that qualifying facility may use as well as produce energy); *Alcon I*, J.A. at 253 (Stalon, Comm'r, dissenting) (pharmaceutical plant and leased cogeneration equipment comprise a unified whole for purposes of § 210).

Thus, whether the producing and consuming elements of a QF be labelled "functions" or "facilities" or something else, the Commission's message was clear enough: § 210 could apply to both.

In this context we cannot attach much weight to the Commission's remark in *Alcon III* that its order in *Alcon II* "did not find that Alcon's pharmaceutical plant was a QF or that Alcon would own or operate a QF." J.A. at 469. It went on to say "there is nothing that needs to be added to our discussion in the previous *Alcon* orders concerning whether Alcon is a QF or owns or operates a QF." *Id.* In view of this disclaimer of any intent to change the prior decision, we cannot take the Commission to have backed off its view that Alcon was a component part of a unified qualifying facility.

## II. CONSTRUCTION OF PURPA AND THE COMMISSION'S REGULATIONS

We now turn to whether the Commission misconstrued §§ 201 and 210 of PURPA when it determined that the consumption component of this cogeneration project was entitled to back-up power even though owned separately from the production component. Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and later cases, our first question must be "whether Congress has spoken directly to the precise question at issue." *Id.* at 842, 104 S.Ct. at 2781. If so, its decision is the law and we must give it effect. *Id.* at 843 & n. 9, 104 S.Ct. at 2781 & n. 9. But if "the statute is silent or

ambiguous with respect to the specific issue," *id.* at 843, 104 S.Ct. at 2781, we may not substitute our own construction of the statutory language for the agency's. Rather, we must defer to the agency's interpretation so long as "the agency's answer is based on a permissible construction of the statute." *Id. Accord NLRB v. United Food & Commercial Workers Union,* —— U.S. ——, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1221–22, 94 L.Ed.2d 434 (1987); *Cablevision Systems Development Co. v. Motion Picture Ass'n of America,* 836 F.2d 599, 607 & n. 12 (D.C.Cir.1988). We find no clear expression of congressional intent and believe the Commission's construction to be altogether reasonable. (We need not decide whether a contrary view could qualify as reasonable.)

Section 201 of PURPA defines a cogeneration facility as

> a facility which produces—
>> (i) electric energy, and
>> (ii) steam or forms of useful energy (such as heat) which are used for industrial, commercial, heating or cooling purposes....

16 U.S.C. § 796(18)(A).

PREPA argues that this definition is a clear congressional statement that only "the particular machinery used in the production of power" may be certified as a QF entitled to back-up power. Petitioner's Brief at 25. We cannot agree. It certainly does not explicitly state that a qualifying facility cannot encompass *both* the production equipment and a closely related consuming entity, or that all parts of a facility must be owned by a single entity. Indeed, the statutory language contains a hint that points in the opposite direction; part of the definition is that the electric power and other useful energy are to be *"used* for industrial, commercial, heating, or cooling purposes." 16 U.S.C. § 796(18)(A)(ii) (emphasis added). PREPA essentially invites us to read the sole functional *requirement* for a "cogeneration facility" to state the facility's sole *permissible* function. Thus we cannot accept PREPA's argument that

the Commission's view "runs athwart the plain language of the statute." Petitioner's Brief at 17.

The legislative history of PURPA is equally unenlightening. The definitions of "cogeneration facility" in the original House and Senate bills, on which PREPA relies, simply state, as does the statute, that cogeneration facilities "produce" energy. *See* H.R. 8444, 95th Cong., 1st Sess. § 546(b)(1); Senate Amendment to H.R. 4018, 95th Cong., 1st Sess. § 113(d)(1) (1977). Excepting these statements and a similar remark in the Senate report, PREPA points to no statement in earlier bills, in Committee reports, or on the floor of either House of Congress, to support its contention that cogeneration facilities may consist *only* of producing facilities. Congress has not, therefore, supplied an unambiguous answer to the question here at issue.

We thus turn to whether the Commission's reading of the statute was a reasonable one, *United Food & Commercial Workers,* 108 S.Ct. at 421; *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781, and have little difficulty concluding that it was. Congress in § 210(a) expressly directed the Commission to promulgate rules which would "encourage cogeneration." 16 U.S.C. § 824a–3(a). It recognized that the guarantee of supplementary power to cogeneration projects was crucial to this goal. For instance, in offering amendments to the original Senate version, Senator Percy stated that an "institutional difficulty" for non-traditional technologies like cogeneration and small power production was that such technologies "cannot replace central electric grids." 123 Cong.Rec. 25,848 (1977). Noting that "some utility companies refuse to interconnect with small power systems, or charge prohibitive electric rates," he stated that "[t]raditional utilities are needed to complement on-site power by providing backup power and by purchasing surplus power." *Id. See also* 123 Cong.Rec. 32,437 (1977) (remarks of Senator Haskell); 123 Cong.Rec. 32,403 (1977) (remarks of Senator Durkin).

PREPA does not identify a single reason why Congress should have intended to remedy these problems solely by allowing companies to compel back-up service running only to the production component of a cogeneration project. Although the producing component may need some electricity for so-called "station uses" (e.g., restarting the facility), it is the *consuming* element, by definition, that has the primary need for back-up power. While we suppose that in the mine run of cases it may make no difference, we can certainly imagine instances—quite apart from the separate ownership issue presented here—where engineering difficulties or accidents of geography would make it inappropriate to route the consuming portion's back-up power through the producing element. It would seem hypertechnical to impose extra costs in every such case. (PREPA also makes an argument, considered below, that would deny the entitlement to the producing element as well, to the extent that it forwards the power to the consuming element!)

Congress also was aware of the possibility that cogeneration projects might involve third-party financing in which different parties owned the producing and consuming equipment. A spokesman for Dow Chemical Company, at the time the nation's largest cogenerator, noted in subcommittee hearings that third-party financing was a valuable option:

> A more sophisticated version of the joint venture might take the form of a "leveraged lease" financing. In this form, a substantial part of the cost of the generating facility would be paid for through equity capital contributed by an investor (or group of investors) seeking the tax benefits generated by the facility.

2 *Public Utility Rate Proposals of President Carter's Energy Program: Hearings on Part E of S. 1469 Before the Subcomm. on Energy, Conservation and Regulation of the Senate Comm. on Energy and Natural Resources,* 95th Cong., 1st Sess. 23,-132 (1977).

■ As Congress was aware of both the necessity of back-up power and the possibility of third-party financing, we think that the Commission's expansive readings of the terms "cogeneration facility" and "qualifying cogeneration facility" properly advance the congressional goal of encouraging cogeneration. It recognized that cogeneration projects are often not feasible without a guarantee of back-up power, *Alcon II,* J.A. at 426 & n. 5, and that separate ownership of production and consuming components could sometimes afford significant financing and tax advantages, *id.* at 426. Indeed, it appears from the record that the vast majority of cogeneration projects (70 percent, according to one intervenor urging rehearing of *Alcon I,* J.A. at 345), are financed with some type of third-party financing, such as leases, joint ventures, or limited partnerships. Moreover, the project at issue in *Alcon II* is by all accounts precisely the type of integrated operation Congress intended to encourage: O'Brien's generating equipment will be built on Alcon's land directly adjacent to the pharmaceutical plant; it will supply only Alcon's plant; it will generate both electricity and useful thermal energy; and Alcon is given the option to purchase the generating equipment from O'Brien at the expiration of the five-year lease. Given the "close nexus," it was altogether reasonable for the Commission to view the QF concept as encompassing both the producing and consuming components of such a project. It properly credited substance over form; to have done otherwise could have doomed numerous projects for no reason related to any statutory goal.

PREPA advances a similar argument based on the Commission's definition of "cogeneration facility" in its regulations. 18 C.F.R. § 292.202(c) defines the term as "equipment used to produce electric energy and forms of useful thermal energy (such as heat or steam), used for industrial, commercial, heating, or cooling purposes, through the sequential use of energy." The Commission's substitution of the word "equipment" for the statutory term "facility" might suggest a purpose to narrow the statutory language, and gives us pause. But PREPA's argument here suffers the same defect as its statutory theory. That

a facility must produce electric power and other forms of energy in order to fit within the regulation need not preclude it from consuming energy as well. Moreover, we owe the Commission even more deference in its interpretation of its own regulations than in the reading of its statutory mandate. *Lyng v. Payne*, 476 U.S. 926, 106 S.Ct. 2333, 2341–42, 90 L.Ed.2d 921 (1986); *United States v. Larionoff*, 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977); *National Trust for Historic Preservation v. Dole*, 828 F.2d 776, 782 (D.C.Cir.1987).

PREPA also extracts an argument from § 210(c) of PURPA, which requires FERC to promulgate rules ensuring that when an electric utility is required to offer power for sale to a QF the rates for such a sale shall not discriminate against the "qualifying cogenerators." 16 U.S.C. § 824a–3(c). § 201 in turn defines a "qualifying cogenerator" as "the owner or operator" of a qualifying cogeneration facility. 16 U.S.C. § 796(18)(C). Building on its premise that Alcon neither owns nor operates a qualifying facility, PREPA argues that FERC's view of § 210(a) leads to the anomaly that PURPA requires sales of back-up power to Alcon while leaving it free to charge discriminatory rates.

This argument falls with our disposition of PREPA's claim that the Commission never found Alcon to be the owner of a QF. Having found Alcon's pharmaceutical plant to be a component part of a qualifying facility, it necessarily found Alcon to be the owner (albeit not the sole owner) of a qualifying facility. Hence, Alcon is a "qualifying cogenerator" and PREPA may not discriminate against it in selling back-up power.

We note in passing a thoroughly startling argument originally made by PREPA, *see* PREPA's Notice of or Motion for Intervention, J.A. at 15–16; PREPA's Answer in Reply to Answer in Opposition, *id.* at 148–49, and tentatively accepted by the Commission in *Alcon I, id.* at 241. 16 U.S.C. § 796(18)(B)(ii) provides—in a clear effort to exclude conventional utilities from the QF field—that a "qualifying cogeneration

facility" may not be "owned by a person *primarily* engaged in the ... sale of [non-cogenerated] electric power." (Emphasis added.) FERC has read this to mean that an electric utility may not own more than 50 percent of a qualifying facility's equity. 18 C.F.R. § 292.206(b). PREPA argued that if O'Brien purchased electricity for resale to Alcon, it would become an "electric utility," defined in 16 U.S.C. § 796(22) as a person or state agency "which sells electric energy," and thus be ineligible for back-up power. On this view Alcon would be denied even an *indirect* entitlement to back-up power.

Happily the Commission in *Alcon·III* vacated the portion of *Alcon II* that appeared to accept this proposition, *see* J.A. at 427–28, and PREPA appears to have dropped the claim. Petitioner's Reply Brief at 7–8 & n. 4. But it is striking that PREPA maintained until the very last stage of this litigation a view that would completely defeat the congressional purpose in any case where the producing and consumption elements of qualifying cogeneration facilities were under separate ownership.

Finally, PREPA suggests that the transfer of cogenerated energy from O'Brien to Alcon pursuant to the lease agreement is in fact a "sale for purposes other than resale," and thus outside the scope of FERC's protective power under § 210(a), which says that the rules authorized thereby may not authorize a QF to make such sales. As sales outside the § 210 rules, PREPA argues, they would be subject to regulation (and thus frustration) by state public utility regulatory authorities (here, perhaps too conveniently, PREPA itself). *See* Petitioner's Brief at 34–35. The short answer to this contention is that we need not address PREPA's speculative concerns until a state authority in fact attempts to regulate the transmission of power between two parts of a qualified cogeneration facility. This case requires us neither to decide whether the transfer of cogenerated power can constitute a "retail sale" nor to determine the scope of state authority to regulate such sales. In these circumstances, we have no occasion to review the Commission's statement that the arrangement

between O'Brien and Alcon would not involve retail sales of power. *See Alcon III,* J.A. at 470.

### III. Conclusion

In *Alcon II,* the Commission determined that Alcon's pharmaceutical plant and O'Brien's cogeneration equipment would be so closely related that they would together make up a single qualifying cogeneration facility entitled to back-up power under § 210(a) of PURPA. We find that determination to be based on a reasonable reading of the statute. Accordingly, we deny PREPA's petition for review.