**BAKER NORTON PHARMACEUTICALS, INC., Plaintiff,**

v.

**UNITED STATES FOOD AND DRUG ADMINISTRATION, Bernard A. Schwetz, Acting Principal Deputy Commissioner, and Tommy G. Thompson, Secretary, United States Department of Health and Human Services,[1] Defendants,**

and

**Bristol–Myers Squibb Co., Defendant–Intervenor.**

**No. CIV. A. 98–927 SSH.**

United States District Court, District of Columbia.

Feb. 6, 2001.

---

1. Pursuant to Federal Rule of Civil Procedure 25(d), Tommy G. Thompson is automatically substituted for Donna Shalala as a party. Michael A. Friedman is no longer Lead Deputy Commissioner of Food and Drugs; as the position is currently vacant, the Court substitutes the FDA's top official at this time, Bernard A. Schwetz, Acting Principal Deputy Commissioner.

Richard M. Cooper, Paul K. Dueffert, Williams & Connolly, Washington, DC, for Plaintiffs.

AUSA Meredith Manning, U.S. Attorney's Office, Washington, DC, for Defendants.

Michael B. Waitzkin, Fox Kiser, Washington, DC, for Defendant–Intervenor.

## OPINION

STANLEY S. HARRIS, District Judge.

This case involves three groups: plaintiff Baker Norton, defendants Food and Drug Administration ("FDA") and two government officials (collectively "the FDA defendants"), and defendant-intervenor Bristol–Myers Squibb ("BMS"). Before the Court are three motions for summary judgment, submitted by each of the three groups. The Court held a hearing on these motions. Upon careful consideration of the entire record, the Court concludes that no genuine issue of material fact exists and that judgment should be entered in favor of defendants and defendant-intervenor. "Findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56." Fed. R.Civ.P. 52(a); *Summers v. Department of Justice*, 140 F.3d 1077, 1079–80 (D.C.Cir. 1998). Nonetheless, the Court sets forth its reasoning.

### I. Background

#### A. The Orphan Drug Act

When the potential market for a drug is small because the target market is relatively small, it is difficult for a pharmaceutical manufacturer to recover the large research and development costs, and even more difficult to realize a worthwhile return on that investment. The Orphan Drug Act therefore was enacted in 1983 to provide an incentive to develop and test drugs for the treatment of "rare diseases or conditions," which is defined to include diseases or conditions affecting fewer than 200,000 Americans. According to the FDA, in the ten years prior to the passage of the Orphan Drug Act, only ten products for rare diseases were developed and approved for marketing without federal funding. Since the passage of the Orphan Drug Act, the FDA has approved at least 172 orphan drugs and biological products; furthermore, more than 700 orphan-designated products currently are being developed.

Designation and approval of a drug as an orphan drug provides certain benefits to the sponsor of the drug. For example, such a designation permits the FDA to assist the sponsor in studying the drug, and allows the sponsor to claim the benefit of certain tax incentives. 26 U.S.C. § 28. More importantly, orphan drug designation and approval confers seven years of non-patent marketing exclusivity. 21 U.S.C. § 360cc(a).

In 1992, the FDA promulgated its final orphan drug regulations on how to implement the orphan drug exclusivity right. One of the regulations, 21 C.F.R. § 316.3(b)(13)(i), provided a definition for determining when two drugs are the "same drug" and thus the second drug may not be approved for market exclusivity. In essence, that regulation provides that two drugs will be considered the same drug if they contain the same active moiety, unless the second drug is deemed to be "clinically superior." 21 C.F.R. § 316.3(b)(13)(i).

To be eligible for orphan drug exclusivity, a drug's sponsor must submit a request to the FDA for designation as an orphan drug. 21 U.S.C. § 360bb(a)(1)(C). If the FDA determines that the drug targets a rare disease or condition, or that there is no reasonable expectation that the cost of developing and making a drug available

will be recovered in the United States, the drug is designated as an orphan drug. 21 U.S.C. § 360bb(a)(2). Because the drug is designated as an orphan drug before it is approved, more than one applicant may receive orphan designation for what later may be deemed the same "drug" for treatment of the same disease or condition. Once the drug is designated an orphan drug, it goes through the approval process for orphan drug exclusivity under 21 U.S.C. § 360cc.

**B. Baker Norton's and BMS's FDA applications**

Baker Norton and BMS are pharmaceutical manufacturers. Baker Norton developed a drug called Paxene, and BMS developed a drug called Taxol. Although the two drugs are manufactured differently, contain some different inactive ingredients (or "excipients"), and have different profiles of impurities, they both contain paclitaxel as their active component. Paclitaxel is the generic name of a naturally-occurring anti-cancer agent extracted in trace amounts from the Pacific yew tree. Both Taxol and Paxene dissolve paclitaxel in ethanol and polyethoxylated castor oil for delivery by injection into a patient's body. While the castor oil provides adequate solubility of the paclitaxel, it also promotes chemical degradation of the paclitaxel. A principal difference between Taxol and Paxene is how each controls the rate of degradation. One of the ways that BMS controls the degradation rate is by removing certain compounds by passing the castor oil over a solid absorbent. Baker Norton uses citric acid, an inactive ingredient, which changes the physical formation of components so as to reduce the rate of long-term degradation of the paclitaxel.[2]

On March 31, 1997, Baker Norton submitted a new drug application requesting approval for Paxene. Among the potential uses of Paxene is for treating Kaposi's sarcoma, an AIDS-related cancer. Because Kaposi's sarcoma qualifies under the Orphan Drug Act as a "rare disease," Baker Norton also sought designation as an orphan drug. On April 15, 1997, the FDA granted orphan designation.

Meanwhile, BMS requested orphan designation for Taxol for treatment of Kaposi's sarcoma on January 31, 1997, and it filed a supplemental new drug application for Taxol on February 4, 1997.[3] On March 25, 1997, the FDA granted Taxol orphan designation for Kaposi's sarcoma.

What ensued essentially was a race for orphan drug approval since both Taxol and Paxene had been granted orphan drug designation; whichever drug was approved first would receive the seven-year period of market exclusivity. On August 4, 1997, the FDA granted approval to BMS to market Taxol as a second-line treatment for Kaposi's sarcoma. On December 24, 1997, the FDA issued a letter decision to Baker Norton indicating that it had determined Paxene to be safe and effective and, in all other respects, approvable, but that it could not confer final approval until August 4, 2004, due to Taxol's period of exclusivity. *See* Letter to Baker Norton dated 12/24/97, Ex. H to Mem. in Supp. of Pl.'s Mot. for Summ. J. Baker Norton could, however, obtain final approval for marketing prior to August 4, 2004, if it could show that Paxene and Taxol should not be considered the "same drug" as defined in 21 C.F.R. Part 316. *Id.* On January 8, 1998, Baker Norton requested reconsideration, supported by further evidence that Paxene was different from Taxol. *See* Letter to FDA dated 1/8/98, Ex. I to Mem. in Supp. of Pl.'s Mot. for Summ. J. The FDA denied that request on March 19, 1998.

---

**2.** Because the Court is not assessing the FDA's determination as to the chemical composition or superiority of the respective drugs, the Court does not discuss in detail other differences between Taxol and Paxene.

**3.** BMS filed a supplemental new drug application because the FDA previously had approved Taxol for ovarian cancer usages.

## C. Baker Norton's lawsuit

On April 14, 1998, Baker Norton filed a two-count complaint against the FDA, challenging its December 24, 1997, deferral of the effective date of approval of its new drug application. Baker Norton does not challenge the FDA's scientific application of its regulation to its new drug application. Rather, Baker Norton contends that the regulation itself is contrary to law, because the FDA's interpretation of the word "drug" is contrary to unambiguous legislative intent, or, alternatively, that its interpretation is unreasonable and impermissible. Baker Norton also contends that the effect of this ruling is to extend improperly an ongoing monopoly by BMS on drugs manufactured from the naturally-occurring cancer-treating compound paclitaxel.

Count I of the complaint alleges that the FDA's interpretation of the term "drug" to encompass just the active ingredient, rather than the entire drug product, as well as its refusal to grant final approval of Paxene, are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A) of the Administrative Procedure Act ("APA"). In Count II of the complaint, Baker Norton argues that the FDA's refusal to grant final approval of Paxene exceeds its statutory authority, *see* 5 U.S.C. § 706(2)(C), since the Orphan Drug Act's definition of "drug" provides no basis for the FDA to defer the effective date of approval of Paxene's application. Baker Norton therefore seeks: (1) a declaratory judgment that the FDA's decision was arbitrary, capricious, an abuse of discretion, contrary to law, and short of statutory right; (2) an injunction to grant approval of Baker Norton's Paxene application effective immediately; and (3) costs and reasonable attorneys' fees.

The FDA defendants and BMS maintain that the FDA regulations interpreting what constitutes the "same drug" are permissible under *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), because the Orphan Drug Act leaves the definition of "drug" ambiguous, and the FDA's interpretation is reasonable, permissible, and consistent with legislative intent.

## II. Legal Standards

### A. Summary judgment standard

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994). Summary judgment may not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original).

### B. Review of agency action

When a court reviews an agency's interpretation of its governing statute, the familiar two-step analysis of *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778, applies. First, the court must look to "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If, however, the stat-

ute is ambiguous or silent, and Congress has not directly addressed the precise issue, then "the question for the court is whether the agency's [interpretation] is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. In deciding whether a construction is permissible, the court considers whether it is "rational and consistent" with the statute. "There is a presumption in favor of the validity of administrative action, and courts are particularly deferential when an agency is interpreting its own statute and regulations." *Pfizer v. Shalala,* 1 F.Supp.2d 38, 44 (D.D.C.1998) (internal quotations omitted). Moreover, the "FDA's policies and its interpretation of its own regulations will be paid special deference because of the breadth of Congress' delegation of authority to FDA and because of FDA's scientific expertise." *Berlex Laboratories, Inc. v. FDA,* 942 F.Supp. 19, 25 (D.D.C.1996) (citing *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986)).

### III. Analysis

#### A. Waiver of arguments

■ As a threshold matter, BMS raises the possibility that this lawsuit is not properly before the court because Baker Norton never brought its current statutory interpretation objections before the FDA. Generally, "claims not presented to the agency may not be made for the first time to a reviewing court." *Washington Ass'n for Television & Children v. FCC,* 712 F.2d 677, 680 (D.C.Cir.1983). This exhaustion requirement applies to both factual agency decisions and legal challenges regarding statutory construction. *See Natural Resources Defense Council, Inc. v. U.S. EPA,* 25 F.3d 1063, 1074 (D.C.Cir. 1994). Furthermore, BMS contends that Baker Norton has not filed a citizen petition, the standard process by which an interested party requests the FDA to "amend or revoke a regulation or order." 21 C.F.R. § 10.25(a). Upon consideration of the arguments and the record, the Court agrees with Baker Norton that this

case is properly before it, and that Baker Norton has not waived its arguments over the course of the prior administrative proceedings.

#### B. Whether legislative intent is clear

The Court starts with the relevant statutory language of the Orphan Drug Act, which states in pertinent part:

> "[I]f the Secretary ... approves an application filed pursuant to section 355 ... *for a drug* designated under section 360bb of this title for a rare disease or condition, the Secretary may not approve another application under section 355 of this title ... *for such drug* for such disease or condition for a person who is not the holder of such approved application ... until the expiration of seven years from the date of the approval of the approved application."

21 U.S.C. § 360cc(a) (emphases added).

Pursuant to the Orphan Drug Act, the FDA promulgated a regulation defining when a second drug is considered the same as a previously approved drug under the Orphan Drug Act:

> If it is a drug composed of small molecules, a drug that contains the same active moiety as a previously approved drug and is intended for the same use as the previously approved drug, even if the particular ester or salt (including a salt with hydrogen or coordination bonds) or other noncovalent derivative such as a complex, chelate or clathrate has not been previously approved, except that if the subsequent drug can be shown to be clinically superior to the first drug, it will not be considered to be the same drug.

21 C.F.R. § 316.3(b)(13)(i).

Because the FDA's regulation effectively establishes that two drugs are the same drug if they have the same active moiety unless one is clinically superior, Baker Norton asserts that the FDA's regulation improperly equates the term "drug" in § 360cc(a) with an "active moiety," con-

trary to legislative intent. Baker Norton does not dispute that the term "drug" can have multiple meanings. Indeed, the Food, Drug, and Cosmetic Act ("FDCA") itself provides that a "drug" can be defined four ways:

> (A) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clause (A), (B), or (C).

21 U.S.C. § 321(g)(1)(A)-(D). Notwithstanding these possible definitions, Baker Norton asserts that Congress clearly intended for the term "drug" in the context of § 360cc(a) to mean a "finished drug product." Baker Norton reasons that the term "drug" in § 360cc(a) is used in the context of an "application for a drug" under section 355. 21 U.S.C. § 355, which governs applications for approval of new drugs, interprets an "application for a drug" to be an "application for a drug product," not just for an active ingredient or active moiety. When considering an application for a drug product, the inactive ingredients, as well as the manufacturing processes, are important and can distinguish one drug product from another. Because Congress chose to use the phrase "application for a drug" in § 360cc(a) and not another phrase, Baker Norton concludes that Congress clearly intended for

the term "drug" to mean a drug product. Furthermore, Baker Norton points out that in *United States v. Generix Drug Corp.*, 460 U.S. 453, 459–60, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983), the Supreme Court reviewed the FDCA's four-part definition of "drug" as well as the structure of the statute, and held that "the term 'drug' is plainly intended throughout the Act to include entire drug products, complete with active and inactive ingredients." [4]

The Court is unpersuaded. Sections 355 and § 360cc(a) are different statutory provisions with different purposes. Section 355 aims to protect public health and safety, which it accomplishes by considering the safety of all parts of any new drug proposed for entry in interstate commerce, *see* 21 U.S.C. § 355(b), whereas the Orphan Drug Act seeks to provide a meaningful financial incentive for the development of orphan drugs. What one statutory provision defines as a "drug" may not necessary control another statutory provision's definition of a "drug," even when used in the same phrase. Courts have held that "it is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the legislature intended it should have in each instance." *Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319–20 (D.C.Cir. 1998).

The Court is persuaded by the Tenth Circuit's reasoning in *Pharmanex v. Shalala*, 221 F.3d 1151, 1159 (10th Cir.2000), in

---

4. Baker Norton also maintains that the FDA may not define "drug" to be an "active moiety" because active moiety does not even come within the four definitions allowable under the FDCA. Citing *Abbott Laboratories v. Young*, 920 F.2d 984, 986 (D.C.Cir.1990), Baker Norton asserts that an active moiety is a "substance that creates the actual therapeutic effect within the body," not a component of a drug product. The Court rejects Baker

Norton's argument, and instead is persuaded by the FDA's definition of an active moiety. An active moiety is not the substance that is created in the body as a result of a chemical reaction. Rather, as FDA regulations define it, the active moiety is "the molecule or ion . . . responsible for the physiological or pharmacological action of the drug substance." 21 C.F.R. § 316.3(b)(2).

which it considered a challenge to an FDA regulation interpreting a different statutory provision, 21 U.S.C. § 321(ff)(3)(B), regarding dietary supplements. That provision stated:

The term "dietary supplement"... does ... not include ... an article that is approved as a new drug under section 355 of this title ... which was not before such approval, certification, licensing, or authorization marketed as a dietary supplement or as a food ....

The *Pharmanex* Court rejected the argument that the term "article" means only "drug products" and not drug components, simply because it is modified by "approved as a new drug under section 355" and only "drug products" may be approved as new drugs. The Court stated:

While it is true that the FDCA provisions relating to approval of new drugs, 21 U.S.C. § 355, discuss approval in the overarching context of finished product approval, it is too simple to suggest that ingredients are in no sense "approved" in the new drug approval process. *See, e.g.,* 21 U.S.C. § 355(c)(3)(D)(i)-(ii) (referring to a drug, "no active ingredient ... of which has been approved" as part of the new drug approval process). It is evident from § 355 that approval of active ingredients is integral to the overall new drug approval process. *See, e.g.,* 21 CFR § 314.50(d)(1)(i)(ii) (requiring a listing and description of drug substance and drug product components as part of the application for new drug approval). The use of the phrase "approved as a new drug" cannot bear the interpretive weight Pharmanex applies to it.

▮ Plaintiff's citation to the *Generix Drug* case is of no avail since that case held only that the definition of "drug" in § 321(g)(1) is "plainly broad enough to describe a completed drug product," but did not find whether other materials such as drug ingredients were excluded from that definition. *See Pharmanex,* 221 F.3d at 1156-7. Given the multiple definitions of the term "drug," and the differing purposes that various statutory provisions can serve, the Court cannot find that the definition of "drug" in § 360cc(a) is clear and unambiguous. The Court finds it more likely that Congress left it to the FDA to determine which definition fits a particular statutory section.

Other courts have agreed that the word "drug" in other statutory provisions can be inherently ambiguous, and may cover more than just a finished drug product. In *National Pharmaceutical Alliance v. Henney,* 47 F.Supp.2d 37 (D.D.C.1999), this court upheld the FDA's interpretation of 21 U.S.C. § 355a, the provision governing exclusivity for pediatric drugs. Similar to the orphan drug provisions, the pediatric drug provision in § 355a allows exclusivity for certain drugs; the FDA then issued a Guidance document allowing additional market exclusivity to a manufacturer's entire line of drug products having "the same active moiety" in exchange for a pediatric study on only one drug product. *See id.* at 39. Like Baker Norton, the plaintiffs in *Henney* challenged the FDA Guidance and argued that the word "drug" as used in the statute must refer to a specific "drug product" because that is the sense in which the word is always used for new drug applications. The *Henney* court rejected this reasoning, noting that neither the language of section 355a nor anything in the legislative history speaks to the definition of "drug," and thus, the statute is ambiguous. *Id.* at 39–40. In *Pfizer, Inc. v. FDA,* 753 F.Supp. 171, 176 (D.Md.1990), the court similarly looked at the meaning of the word "drug" in another statutory provision regarding generic drugs, § 355(b)(1) and (c)(2); noting that the definition of drug can cover "both a finished 'drug product' and its active and inactive ingredient or ingredients," it ultimately decided that the word "drug" in the context of that statutory provision meant finished drug product. The Court does not find that § 360cc(a) is clear and unambiguous.

**C. Whether the FDA's interpretation is permissible**

▮ Because the Court has determined that the meaning of § 360cc(a) is ambiguous, the Court turns to whether the agency's interpretation is based on a permissible construction of the statute. First, Baker Norton asserts that instead of considering whether two drugs have the same "active moiety," the FDA should adopt a "functionality" test: that is, the FDA should consider whether other ingredients in the product may create a functionally different product. Such a test, Baker Norton contends, would prevent companies from claiming that two drugs with the same active moiety are "different" simply by adding ingredients of *de minimis* import and thereby compromise a prior company's market exclusivity. In Baker Norton's case, Paxene's use of citric acid creates a functionally different drug because the citric acid helps reduce the rate of degradation of paclitaxel. The FDA defendants and BMS assert that a functionality test would vitiate the market exclusivity provision because many drug products could contain the same active moiety yet be functionally different. Whether such a "functionality test" would improve the current regime, however, does not necessarily undermine the permissibility of the FDA's interpretation. Under the *Chevron* test, the Court considers only whether the agency's interpretation is permissible, not whether a better interpretation exists.

Baker Norton also maintains that the FDA's regulation is not permissible because it violates the well-established doctrine that grants of monopolies should be narrowly construed. *E.g., United States v. Studiengesellschaft Kohle m.b.H.*, 670 F.2d 1122, 1127 (D.C.Cir.1981). *See also Genentech, Inc. v. Bowen*, 676 F.Supp. 301, 312 (D.D.C.1987) ("[a] review of the Act's legislative history . . . sheds no direct light on the question of how broadly or narrowly the word 'drug' should be construed in § 360bb(a). . . . [However], [i]n enacting the Orphan Drug Act, Congress clearly focused on the availability of treatments, not the existence of prior NDAs [new drug applications].") The Court finds, however, that the FDA's interpretation does not produce so sweeping a monopoly as plaintiff would suggest: the market exclusivity rights are limited in time to seven years, and granted only for a particular drug for a particular use. Nothing prevents subsequent applicants from obtaining FDA approval for the same drug for a different use, or a different drug for the same use, or a clinically superior drug with the same active moiety for the same use.

The Court finds that the FDA's interpretation is permissible. The interpretation of "same drug" appears to bear out the purpose behind the Orphan Drug Act. The preamble to the 1991 proposed regulations implementing the Orphan Drug Act states:

> [W]ith respect to small molecules, it appears sound, for the purposes of consideration of exclusive marketing under the Orphan Drug Act, to adopt a policy that regards two drugs as different if they differ with respect to the chemical structure of their active moieties. First, such differences are highly likely to lead to pharmacologic differences. Second, the development of an agent with a novel active moiety is not a financially or intellectually trivial matter; it represents a considerable effort and a substantial risk
>
> . . . .

With respect to small molecules, it appears sound, for the purposes of consideration of exclusive marketing under the Orphan Drug Act, to adopt a policy that regards two drugs as different if they differ with respect to the chemical structure of their active moieties. First, such differences are highly likely to lead to pharmacologic differences. Second, the development of an agent with a novel active moiety is not a financially or intellectually trivial matter; it represents a considerable effort and a substantial risk, as the results of changes in small molecules are difficult to predict.

**38**

56 Fed.Reg. 3338, 3341 (Jan. 29, 1991). Only 1 of the 40 comments received during the rulemaking stage suggested an alternate approach for distinguishing among different small-molecule drugs, and that alternate approach was rejected as unworkable.

The regulation's manner of determining "sameness" appears to promote the obvious legislative intent behind the Orphan Drug Act—to promote the development of orphan drugs. The financial incentive for companies to develop such drugs is provided by the period of market exclusivity, which would be undermined if other companies could develop drugs with the same active moiety but minor differences in inactive ingredients. The interests of patients who need such drugs are served by the approval of drugs which have the same active moiety but are clinically superior. *See Arent v. Shalala*, 70 F.3d 610, 615 (D.C.Cir.1995) ("[A] reviewing court's inquiry ... is focused on discerning the boundaries of Congress' delegation of authority to the agency; and as long as the agency stays within that delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference.").

### Conclusion

The Court finds that the word "drug" in 21 U.S.C. § 360cc(a) of the Orphan Drug Act is ambiguous, and that the FDA's interpretation contained in 21 C.F.R. § 316.3(b)(13)(i) is permissible. The Court therefore finds that the FDA's actions with regard to Baker Norton's application for approval of Paxene are not arbitrary and capricious, or in excess of statutory authority. Accordingly, the Court denies plaintiff's motion for summary judgment, and grants the FDA and BMS's motions for summary judgment. An appropriate Judgment accompanies this Opinion.

### JUDGMENT

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that plaintiff's motion for summary judgment is denied. It hereby further is

ORDERED, that defendants' motion for summary judgment is granted. It hereby further is

ORDERED, that defendant-intervenor's motion for summary judgment is granted. It hereby further is

ORDERED, that judgment is entered in favor of defendants and defendant-intervenor.

SO ORDERED.